UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALVIN SINGER #2472037                             CIVIL ACTION

VERSUS                                             NUMBER: 19-09791

MARLIN N. GUSMAN, ET AL.                          SECTION: "S"(5)

**REPORT AND RECOMMENDATION**

Before the Court is the Rule 12(b)(6) motion to dismiss filed by Defendants, Dr. Xuong Nguyen, "Grievance Nurse" Lisa Pittman, Nurse Practitioner Deborah Gray, "Mental-health Counselor" Marvin Trudeau, and "Mental-health Provider" Patrick Riley. (Rec. doc. 19). Plaintiff has filed no memorandum in opposition to Defendants' motion.[1/] For the reasons that follow, it is recommended that Defendants' motion be granted and that Plaintiff's lawsuit be dismissed in its entirety.

Plaintiff is an inmate of the Allen Correctional Center in Kinder, Louisiana, who was at one time housed in the Orleans Justice Center ("OJC") in New Orleans, Louisiana. (Rec. docs. 1, p. 2; 9). In the above-captioned complaint filed pursuant to 42 U.S.C. §1983 against the five moving Defendants and Orleans Parish Sheriff Marlin N. Gusman, Plaintiff presents a series of allegations that will be summarized here in chronological order to facilitate a better understanding by the reader. In April/May of 2018, prior to his arrest and processing into the OJC on June 30, 2018, Plaintiff experienced an episode of his right arm

---

[1/] As Plaintiff has filed no memorandum in response to Defendants' motion, timely or otherwise, the Court may properly assume that he has no opposition to it. *Johnson v. Colvin*, No. 14-CV-0401, 2014 WL 4186790 at *1 n. 1 (E.D. La. Aug. 22, 2014)(citing Local Rule 7.5 and *Bean v. Barnhart*, 473 F.Supp. 2d 739, 741 (E.D. Tex. 2007)); *Jones v. Larpenter*, No. 13-CV-0056, 2013 WL 1947243 at *1 n. 1 (E.D. La. Apr. 12, 2013), *adopted*, 2013 WL 1947188 (E.D. La. May 10, 2013)(same); *Lucas v. Crowe*, No. 11-CV-2752, 2013 WL 870514 at *1 n. 1 (E.D. La. Feb. 15, 2013), *adopted*, 2013 WL 870437 (E.D. La. Mar. 7, 2013)(same). Of course, a motion like the Defendants', even if unopposed, may be granted as long as it has merit. *Braly v. Trail*, 254 F.3d 1082, 2001 WL 564155 at *2 (5th Cir. 2001).

"locking up," which necessitated a visit to the University Medical Center ("UMC") Emergency Department. During that visit, it was reportedly discovered that Plaintiff had a foreign body in the elbow area of his right arm in the form of a broken needle that had been lodged there perhaps since as early as 1996. When he was subsequently booked into the OJC shortly thereafter, Plaintiff states that he informed admitting jail officials of the presence of the needle, his past medical history, and a host of medical conditions from which he suffered, including arthritis, particularly in the knees with attendant fluid and swelling, chronic back pain secondary to a dislocated disc in the lower back, and various mental conditions. Plaintiff indicates that he duly advised OJC screening officials of the identities of the healthcare providers who had treated him prior to his incarceration, the various medications they had prescribed, and the fact that he had used a walker and a cane for ambulation.

  After being processed into OJC, Plaintiff states that on July 3, 2018 an unidentified dispensing nurse failed to provide him with any of the medications that had been prescribed to him when he was on the street,[2]/ instead giving him only Naproxen, Tylenol, and Mirtazapine. According to Plaintiff, this practice persisted for a period of months, ultimately causing him to pursue administrative grievance proceedings against the OJC medical and mental-health departments. Plaintiff states that on October 2, 2018, he put in a request for medical care respecting the needle that was lodged in his right arm as well as his knee issues. Shortly thereafter, Plaintiff received three x-rays at OJC which were interpreted by Dr. Nguyen and NP Gray as revealing no foreign body but rather a fracture

---

[2]/ Plaintiff identified these medications as including Cephalexin, Ibuprofen, Fluticasone/Acutation Nasal Spray, Gabapentin, Loratadine, Meloxicam, Methocarbamol, Trazodone, and Hydrocodone/Acetaminophen. (Rec. doc. 1, p. 7).

to the right elbow. Plaintiff states that he was then transported to UMC on October 8, 2018 where an additional eight x-rays were taken, all of which were reportedly negative for fracture but did reveal the broken needle lodged in his arm, as well as arthritis. These conflicting diagnoses caused Plaintiff to submit more sick-call requests concerning the needle, as well as a grievance to Nurse Pittman that was later responded to by one K. Kelly who stated that both the OJC and UMC radiographic studies had demonstrated no foreign body in his right arm. On October 22, 2018, Plaintiff spoke with Nurse Pittman regarding his medical issues who, in summarizing the medical treatment that he had received, wrongfully advised him that he had been seen at OJC for a right arm fracture rather than the needle and knee issues he had actually complained of.

Instead of being provided with the mental-health medications he had been prescribed before his incarceration, Plaintiff states that he was put on "Prezosa," which resulted in him breaking out in a rash all over his body. Pursuant to another sick call request, Plaintiff was seen by Dr. Nguyen, who discontinued the medication and e-mailed the mental-health department regarding the medication's side effects. Although initially being advised that he would be reevaluated in 24 hours, Plaintiff states that he was not seen in the mental-health department until one month later when he was prescribed Mirtazapine and Sertraline. Throughout the entirety of the time that he was housed at OJC, Plaintiff alleges that he has never seen any specialist or received x-rays or MRI studies regarding his knees, despite a surgical recommendation having been made prior to his incarceration. Nor has he received any medication for his arthritis or chronic back pain. This caused Plaintiff constant pain and suffering and resulted in him being confined to a wheelchair secondary to an inability to stand, to walk for prolonged periods of time, or to

ascend stairs. Plaintiff seeks an unspecified amount of compensatory damages for the pain and suffering that he endured. (Rec. doc. 1, p. 6). He attaches to his complaint a number of grievances, sick call requests and the responses to same, as well as records documenting a visit to the Touro Emergency Department on June 29, 2018, where he was treated for various injuries following an assault. (Rec. docs. 1-1, 1-2).

The moving Defendants now move for the dismissal of Plaintiff's claims against them pursuant to Rule 12(b)(6). More specifically, Defendants Riley, Trudeau, and Gray argue for the dismissal of Plaintiff's claims as he has not alleged any facts regarding their involvement in the matters complained of. For their part, Dr. Nguyen and Nurse Pittman point to a lack of allegations establishing serious harm as a result of their actions, a paucity of allegations demonstrating an awareness of and indifference to any risk of harm, and because the acts of which Plaintiff complains are all in the nature of medical decisions made by healthcare providers. As noted above, Plaintiff has filed no memorandum in opposition to Defendants' motion.

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a claim if the plaintiff fails to plead factual allegations in support of his claim that would entitle him to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). Those "'[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009), *cert. denied*, 559 U.S. 936 (2010) (quoting *Twombly*, 550 U.S. at 555). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial

4

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party, *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009), but the Court need not accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* at 677 (citing *Twombly,* 550 U.S. at 555). Of particular importance in a civil rights case like this one is pleading the essential element of personal involvement. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). "To state a cause of action under §1983, the plaintiff must allege facts reflecting the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant." *Jolly v. Klein*, 923 F.Supp. 931, 943 (S.D. Tex. 1996)(citing *Murphy v. Kellar* 950 F.2d 290, 292 (5th Cir. 1992)).

To better assess the sufficiency of the allegations made by Plaintiff against the named Defendants, the Court previously ordered that it, as well as Plaintiff, be provided with a copy of the medical records generated and compiled during the time that he was housed at OJC. (Rec. doc. 20). Those records, which are fairly voluminous at 565 pages, will not be discussed in their entirety here but only to the extent necessary to resolve the matter at hand. On June 30, 2018, the day of his arrest, Plaintiff was seen at the University Medical Center in New Orleans' ("UMCNO") Emergency Department for "[m]ed clearance after blunt trauma" involving the right knee, left shoulder, left forearm, and abdomen.[3] X-

---

[3] Plaintiff attached to his complaint a three-page note from the Touro Emergency Department dated June 29, 2018, the day before his arrest, where he was treated for an assault, closed head injury with brief loss of consciousness, hand laceration, and multiple contusions. (Rec. doc. 1-2, pp. 4-6).

5

rays of the affected areas were unremarkable. The impression was blunt trauma without significant injury and Plaintiff was medically cleared for admission into the OJC. After being transported there, Plaintiff underwent a receiving assessment during which he advised medical personnel of an acute musculoskeletal issue in the form of infective arthritis, not otherwise specified, and chronic psychiatric problems in the form of schizophrenia, not otherwise specified. Plaintiff also advised of a number of medications he had been taking including Oxycodone, Naprosyn, Remeron, Zoloft, and others he could not identify by name which he had received from CVS or Walgreens. Plaintiff was noted to have a normal appearance and was not restricted in movement in any way but he was observed to have sutures in the left hand, contusions to the head, hand, knee, and abdomen, and a superficial laceration to the back of the head that was possibly the result of an altercation at the jail. A previous suicide attempt was noted. Plaintiff was referred for a withdrawal protocol and mental-health care. He duly executed authorizations for the release of his medical records from outside providers and drugstores and he was placed on a five-day detox protocol which included Meclizine, Loperamide, Acetaminophen, and an electrolyte replacement drink. Substance abuse history was positive for alcohol, heroin, and cocaine. HIV and TB testing was negative and a mental status examination was normal. He was repeatedly re-assessed throughout the course of the day.

   Plaintiff went through multiple re-assessments over the next several days and no bone/joint aches were noted. A referral to the GI/Urology Clinic was made on July 3, 2018 following a follow-up examination. Plaintiff submitted a sick call request for mental-health treatment on July 4, 2018 and was seen by a mental-health counselor who noted an increase in anxiousness and an inability to sleep. Further evaluation by a social worker

was scheduled. The detox protocol continued through July 5, 2018 and Plaintiff received his medications at his assigned location in a bottom bunk. Plaintiff submitted another sick-call request on July 6, 2018 seeking reading glasses. He underwent an eye examination that day as well as a musculoskeletal evaluation in connection with pain with no obvious injuries following a fall in the holding tank several days earlier.

On July 8, 2018, a sergeant performing routine rounds advised the medical department that Plaintiff needed to be assessed secondary to a fight that had occurred three days earlier. Plaintiff, however, denied that an altercation had occurred and declined to be assessed, executing a "Refusal of Treatment" form to that effect. The following day, Plaintiff submitted a "Healthcare Request" seeking evaluation for a dislocated disc in his back, a need for bilateral knee replacement, a bruised right hip and shoulder, sutures to his left hand, constipation, and migraine headaches. Plaintiff refused to be triaged for those conditions but he did undergo a behavioral assessment by a mental-health professional and complained of not receiving Seroquel and Gabapentin. Plaintiff appeared agitated and increasingly anxious on this occasion with poor use of coping skills and reported ongoing sleeping issues. A mental-status examination was conducted and Plaintiff was referred to the psychiatrist and was counseled on seeking sick call for his physical issues. Plaintiff entered segregation on that same date for reasons that are not apparent from the records provided to the Court. He was physically and mentally assessed the following day and was dispensed Ibuprofen but declined to make sick call, advising that his "… concerns were already addressed."

Pursuant to the authorization Plaintiff had executed upon his processing into OJC, on July 12, 2018, the facility was provided with various medical records documenting

treatment he had received prior to being incarcerated. Those records reveal recent treatment for a cough and pneumonia-related symptoms as well as right ulnar neuropathy. The records also document a history of degenerative changes in the knees; degenerative disc disease at L5-S1 and T12-L1 with spondylosis at L5; and right elbow pain associated with degenerative changes and an old needle fragment. Physical examinations on these dates were normal with respect to the back and musculoskeletal system with a full range of motion. Other treatment was administered for sinus issues and right great toe pain due to a protruding callus. A past history of hepatitis C was also noted as was depression/anxiety and possibly PTSD. Plaintiff had received steroid injections to the knees on April 18, 2018 and he was observed to wear braces on the knees and wrists. Among these pre-incarceration records were radiographic studies of the lumbar spine from April 14, 2018 and those of the knees taken on March 25, 2018 which documented degenerative disc disease and L5-S1 and T12-L1, apparent spondylosis at L5, moderate degenerative changes to the left knee, and moderate to severe changes of the right knee for which Plaintiff was to begin standard conservative treatment.

On July 13, 2018, Plaintiff submitted another "Healthcare Request" form complaining of not receiving the range of mental-health medications he had been taking prior to his incarceration Plaintiff was seen by a psychiatric nurse who performed a mental-status examination and scheduled an appointment for the following day with a psychiatric provider. He was also counseled on continuity of care in advance of his possible transfer to federal custody. Another Healthcare Request form was submitted by Plaintiff on July 16, 2018 regarding the adequacy of mental-healthcare at OJC and he was seen and evaluated by a psychiatrist on July 18, 2018 who referred him to the medical department

where he received a full physical assessment. Plaintiff was prescribed Prazosin and Zoloft. A discharge planning assessment was conducted on July 23, 2018. Plaintiff submitted another grievance on August 6, 2018 complaining of chronic knee and back pain and the needle lodged in his right arm. That grievance was responded to on August 8, 2018 and follow-up with the medical director was to be scheduled. Plaintiff complained of his bunk assignment on that same date and he received an orthopedic evaluation the following day and was provided Acetaminophen for his chronic arthritic pain which was rated as "3."

On August 19, 2018, Plaintiff refused the Zoloft that had been prescribed to him. A mental-health evaluation scheduled for August 20, 2018 could not go forward as Plaintiff was in court that day. Further medical evaluation went forward on August 22, 2018 and Plaintiff was prescribed Ibuprofen to manage the arthritis pain in his hands and knees. Plaintiff complained of the effectiveness of his psychiatric medication on August 25, 2018 and he was reminded of his upcoming substance abuse group session. He was evaluated again by mental-health provider on August 27, 2018 and an appointment with a psychiatrist was scheduled. Continued knee pain was complained of on August 29, 2018 and it was noted that Plaintiff was already on Ibuprofen. Plaintiff rated his bilateral knee pain as an "8" on August 30, 2018 and he was continued on Acetaminophen. He next attended substance abuse group counseling the following day where he actively listened and participated in reading and group discussion.

Plaintiff put in another medical/sick call request on September 5, 2018, complaining of pain, swelling, and locking up of the elbow where the needle was lodged and follow-up evaluation was scheduled for the following week. He attended another substance abuse group meeting on that same date in which he was an active participant. The following day,

9

Plaintiff underwent a further mental-health evaluation and he was described as pleasant and cooperative, doing well overall with no behavioral problems, and compliant with his medication. The dosages of Celexa and Prazosin were adjusted. At another orthopedic evaluation on September 7, 2018, Plaintiff again complained of the needle that had been lodged in his right arm since as early as 1996. He was instructed on self-care techniques and further evaluation was to be scheduled. Additional Ibuprofen was requested by Plaintiff on September 12, 2018. Plaintiff did not attend mental-health counseling on September 14, 2018 due to an interruption of services.

On September 17, 2018, Plaintiff requested another pair of reading glasses after he left his spectacles unattended and they went missing. Another pair of glasses was provided to Plaintiff the following day. Substance abuse counseling on September 20, 2018 did not go forward as a result of interruption of services. On September 23, 2018, Plaintiff complained of a painful callus on his right great toe which was excised four days later and he was furnished antibiotic ointment. Additional sick call requests were made by Plaintiff on September 24, 2018 regarding his need for Poligrip and mental-health continuity care in the event of his possible release from custody. The social worker provided the requested information the very next day. A mental-status examination performed on this date was unremarkable. Plaintiff was seen by a mental-health counselor on September 27, 2018 regarding ineffective pain relief and to discuss issues with nightmares and sleep. He was given literature on coping with nightmares and progressive muscle relaxation exercises.

On September 28, 2018, Plaintiff submitted yet another grievance regarding perceived delays in receiving the medical care he had requested. He actively participated in substance abuse group therapy on that same date. Two days later, he again complained

10

of the delay on follow-up treatment for the needle fragment lodged in his right arm. Plaintiff was thoroughly evaluated by Dr. Nguyen on October 2, 2018 during which he related a long history of osteoarthritis in the knees for which he had been prescribed an array of anti-inflammatory drugs. He also related a probable history of the needle lodged in his right elbow and use of a walker at home for some 10 years. Plaintiff was prescribed Naproxen and Methocarbamol and was continued on Prazosin. Upon physical examination, Plaintiff had right knee pain with no inflammation and normal pulses in the right elbow. Plaintiff was prescribed Naproxen and Methocarbamol and was continued on Prazosin. X-rays of the right elbow were scheduled for October 4, 2018.

Plaintiff attended a follow-up mental-health appointment on October 3, 2018 and was receptive to receiving therapeutic information. A mental status examination was normal. Bloodwork was also performed on that date. X-rays of Plaintiff's right elbow were taken the following day which were interpreted by the attending radiologist, Dr. William Mask, as demonstrating acute fracture of the radial head. Based on that report, Dr. Nguyen placed Plaintiff on sick call for October 8, 2018. Plaintiff attended substance abuse group therapy on October 5, 2018 and was said to be verbal and attentive.

On October 8, 2018, Plaintiff met with Dr. Nguyen to discuss the radiologist's report of October 4, 2108. After being advised that the x-rays revealed a fracture of the radial head, Plaintiff disavowed any history of right elbow trauma or fracture and reported that nine months earlier, a doctor had told him of the presence of the foreign body. Based on the results of the radiologist's report, Dr. Nguyen ordered that Plaintiff be transported to the UMCNO Emergency Department for further evaluation. Plaintiff was duly transported to UMCNO that very day. In the discharge instructions of the three-page report that was

11

generated as a result of that visit is the following statement: "[p]ertinent study results: xray of humerus, forearm and elbow: no fracture, degen, joint disease." Below that statement appears the notation "[i]mpression: [r]ight elbow pain." However, on the first page of the report the diagnosis was identified as "RIGHT ELBOW PAIN and FOREIGN BODY IN RIGHT FOREARM SEQUELA." A handwritten notation of "Rt elbow swollen" also appears on the first page of the report.

The following day, Plaintiff was seen by Nurse Marshall of OJC and the "Progress Notes" of Plaintiff's medical chart were updated to reflect the UMCNO diagnosis of "RIGHT ELBOW PAIN AND FOREIGN BODY IN RIGHT FOREARM SEQUELA, OBSERVED RIGHT ELBOW NOTED ENLARGED ELBOW AND REDNESS DENIES PAIN @ PRESENT TIME STAFF WILL CONTINUE TO MONITOR AND REPORT ALL ABNORMAL FINDINGS TO PROVIDER WILL SCHEDULED (sic) FOR CLINIC APPOINTMENT." Plaintiff was continued on Naproxen. On October 12, 2018, Plaintiff's Prazosin was discontinued first by a mental-health provider and then by Dr. Nguyen who made an "urgent referral" to the mental-health department to place Plaintiff on a substitute medication.

On October 19, 2018, Plaintiff submitted another grievance explaining that he was in the process of filing a complaint regarding the adequacy of the medical care he had received, reporting that despite submitting numerous requests, he had never been treated for his knees or mental-health issues. Plaintiff was seen on that date for evaluation of internal pain to the right ear of one week's duration. He next presented to the OJC medical clinic on October 22, 2018, reporting frequent auditory hallucinations of his deceased brother and mother and nightly nightmares with sweating. Plaintiff also advised of the discontinuation of Prazosin secondary to a rash. A mental-status examination was normal

and Plaintiff presented as lucid with a calm demeanor and no notable signs of instability or distorted thought processes. He was advised of a pending psychiatric appointment.

On November 2, 2018, Plaintiff was provided a wheelchair which he duly signed for. He had an acute care visit to the OJC clinic on November 5, 2018 for ear wax impaction in both ears and to monitor his blood pressure level. In addition to his Naproxen and Zoloft, Plaintiff was prescribed Bactrim, Maxitol, and Prazosin. The following day, he attended a mental-health/skill building group therapy session, actively listening and engaging in the group discussion, offering feedback, and asking good questions. Plaintiff submitted another medical/sick call request on November 7, 2018 requesting to see a doctor about the needle lodged in his arm which was causing it to swell and lock up. Nurse Kelly responded to that request the following day by advising Plaintiff that neither the x-rays done at OJC or UMCNO revealed a needle in his arm. Additional Maxitrol was ordered on November 9, 2018 for treatment of Plaintiff's ears. Further treatment for that condition was administered on November 12, 2018. Methocarbamol was discontinued by Dr. Nguyen on November 14, 2018 who, the following day, again referred Plaintiff to the mental-health department for a substitute for Prazosin. Plaintiff attended another mental-health/skill building group session that same day.

Over the nearly next six months of his stay at OJC, Plaintiff continued to receive ongoing medical evaluation, management, and treatment for a variety of physical and mental-health conditions, sometimes as frequently as several times on a given day. Between November 16, 2018 and his ultimate transfer from OJC on May 7, 2019, the Court could locate only two spans of time in which seven or more days elapsed between one form of action or another being taken with respect to Plaintiff's medical care. Throughout the

entire period, Plaintiff was treated with Naproxen for his arthritis-related pain complaints and also with Tylenol and Prednisone on other occasions. Admittedly, while there were perhaps a smattering of occasions on which Plaintiff was promised follow-up care which did not materialize within the noted time frame, there is no indication that these instances were the result of anything more than simple neglect or mismanagement and in subsequent treatment notes, Plaintiff would proclaim that his medical problems had resolved. Indeed when x-rays of Plaintiff's right wrist, elbow, and knee were ordered but only those of the wrist came to fruition, a sick call request form that he submitted on April 10, 2019 was promptly responded to that very day by OJC officials, who openly apologized for the oversight. In a subsequent progress note, it was explained to Plaintiff that a generator test was the cause for an interruption to the on-site x-ray clinic. X-rays of Plaintiff's right elbow, wrist, and knee were taken within days thereafter. Those of the elbow, taken by Dr. Mask, were interpreted by him as revealing the healing of the radial head fracture he had previously reported on October 4, 2018 with no mention of a foreign body within, only arthritic changes. Throughout this nearly six-month period, the Court counted eight separate occasions on which treatment or counseling that had been prescribed and made available to Plaintiff was refused by him.

It is against the backdrop of the above-described prison medical records, records upon which the Court may properly rely, *Gobert v. Caldwell*, 463 F.3d 339, 346 n. 24 (5th Cir. 2006)[4]/ that the sufficiency of the allegations made by Plaintiff against the named Defendants be analyzed. In order to establish a constitutional violation, Plaintiff must demonstrate that the Defendants were deliberately indifferent to his serious medical needs

---

[4]/ "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).

which constituted an unnecessary and wanton infliction of pain.[5]/ *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991). Deliberate indifference is an "extremely high" standard to meet, *Gobert*, 463 F.3d at 346, one that has been equated with "subjective recklessness" as that term is used in criminal law. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997). A prison official shows deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994).

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (footnote omitted). "An incorrect diagnosis by prison medical personnel [similarly] does not suffice to state a claim for deliberate indifference." *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)(citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). If an inmate in fact receives medical treatment, federal constitutional protections are not violated simply because that treatment was unsuccessful or because pain or other symptoms persist despite the treatment. *Gobert*, 463 F.3d at 345; *Williams v. Chief of Medical Operations, Forrest County Jail*, No. 94-10115, 1994 WL 733493 at *2 (5th Cir. Dec. 27, 1994); *Kron v. Tanner*, No. 10-CV-0518, 2010 WL 3199854 at *7 (E.D. La. May 19, 2010), *adopted*, 2010 WL 3171040 (E.D. La. Aug. 6, 2010). That an inmate's medical care "… may not have been the best money could buy" is insufficient to establish a constitutional

---

[5]/ Regardless whether Plaintiff was a pre-trial detainee or a convicted prisoner, the standard regarding the provision of medical care to him is the same. *Hale v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996).

15

violation, *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992), and a prisoner is not entitled to medical treatment of his choosing simply upon request. *Stafford v. Kelly*, No. 09-CV-0133, 2011 WL 2633034 at *2 (N.D. Miss. June 3, 2011), *adopted*, 2011 WL 2633174 (N.D. Miss. July 5, 2011). Nor does the failure to provide a specialist in the field of an inmate's choosing state a claim for deliberate indifference. *Green v. McKaskle*, 788 F.2d 1116, 1127 (5th Cir. 1986). And where a §1983 claim is premised on a delay in the provision of medical care, a prisoner must also establish that he suffered substantial harm as a result of the delay. *Richard v. Martin*, 390 Fed.Appx. 323, 325 (5th Cir. 2010). "Experiencing 'occasional delays in obtaining' medical treatment is insufficient to prove a refusal of providing medical care when the inmate's ... medical records demonstrate that he received treatment." *Taylor v. Bexar County*, No. 10-CV-0045, 2011 WL 759549 at *4 (W.D. Tex. Feb. 23, 2011)(quoting *Gobert*, 463 F.3d at 346); *Richard*, 390 Fed.Appx. at 324-25.

As respects the five moving Defendants, the medical and other prison records that are presently before the Court fall far short of establishing the objective and subjective components needed to prevail on a claim of deliberate indifference. At the outset, the Court notes that although Plaintiff makes some allegations respecting Dr. Nguyen, Nurse Pittman, and NP Gray, his complaint contains no allegations of wrongdoing whatsoever on the part of Trudeau or Riley. At best, the allegations that Plaintiff does make against Dr. Nguyen and NP Gray are that they wrongfully relied on a radiologist's report and/or misinterpreted x-rays taken at OJC as revealing no foreign body but instead a fracture to his right elbow. The allegations that Plaintiff makes against Nurse Pittman are that she misread his medical records to erroneously indicate that he had requested medical care and was seen for a right elbow fracture when he had actually sought treatment for the needle lodged in his right

16

arm and his knees. That misinformation allegedly caused Plaintiff to lodge a grievance against Nurse Pittman which was later responded by one "K. Kelly," who is even not named as a Defendant in this proceeding.

Plaintiff's allegations against Nguyen, Pittman, and Gray are more in the nature of misdiagnoses and misinterpretation of medical records rather than a refusal to treat him, ignoring his complaints, intentionally treating him incorrectly, or engaging in similar conduct that would evince a wanton disregard for any serious medical needs. *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). "It has consistently been held that an inmate who has been examined by medical personnel fails to set forth a valid showing of deliberate indifference to serious medical needs," *Gillis v. Goodwin*, No. 13-CV-2506, 2015 WL 3622675 at *3 (W.D. La. Jun. 9, 2015), and a prisoner's disagreement with the diagnostic measures or methods of treatment afforded by prison officials does not state a claim for Eighth Amendment indifference to serious medical needs. *Id.* at *2 (citing *Norton*, 122 F.3d at 292). This principle extends to Plaintiff's disagreement with the medications that he was provided at OJC as compared with those that he had been prescribed prior to his incarceration. *Tassin v. Pacheco*, No. 08-CV-1079, 2009 WL 959985 at *3 (W.D. La. Apr. 8, 2009). It is beyond cavil that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference and the decision of whether to provide additional treatment is a classic example of a matter for medical judgment. *Domino*, 239 F.3d at 756. Even the "'failure to alleviate a significant risk that [the official] should have perceived but did not' is insufficient to show deliberate indifference." *Id.* (quoting *Farmer v. Bennan*, 511 U.S. 825, 838, 114 S.Ct. 1970, 1979 (1994)). As was aptly noted by the Fifth Circuit, "[c]ontinuing back [or other] pain is

unpleasant. Its existence does not, however, in and of itself demonstrate that a constitutional violation occurred." *Mayweather*, 958 F.2d at 91. In short, the determinative issue here is not whether the medical care that Plaintiff received at OJC was substandard in some respect, whether his medical problems, pain, or other symptoms persisted despite the treatment, or whether he was dissatisfied with his care; rather, it is only whether his serious medical needs were met with deliberate indifference <u>by</u> <u>the</u> <u>moving</u> <u>Defendants</u>. Based upon a review of the record that is presently before it, the Court easily answers that question in the negative.

With the recommended granting of Defendants' motion and the dismissal of Plaintiff's claims against them, that leaves before the Court as the remaining Defendant Sheriff Gusman. Notwithstanding the Sheriff's failure to join in or to file a similar motion, because Plaintiff is proceeding *in forma pauperis* in this matter, the Court is empowered to screen his complaint and to dismiss those claims that fail to state a claim upon which relief can be granted. 28 U.S.C. §1915(e)(2)(B)(ii). Giving Plaintiff's complaint a liberal reading, it is the undersigned's recommendation, for the reasons that follow, that Plaintiff's claims against the Sheriff be dismissed for failing to state a claim upon which relief can be granted.

Because Plaintiff gives no indication in his complaint of the capacity in which the Sheriff is being sued, it is generally presumed by operation of law that the Sheriff is named in his official capacity. *Douglas v. Gusman*, 567 F.Supp.2d 877, 888-89 (E.D. La. 2008). "In a suit brought against a municipal official in his official capacity, the plaintiff must show that the municipality has a policy or custom that caused his injury." *Carter v. Strain*, No. 09-CV-0015, 2009 WL 3231826 at *2 (E.D. La. Oct. 1, 2009)(quoting *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007), *cert. denied*, 555 U.S. 813, 129 S.Ct. 42 (2008)). "'A plaintiff may

18

not infer a policy merely because harm resulted from some interaction with a governmental entity.'" *Id.* (quoting *Colle v. Brazos County, Texas*, 982 F.2d 237, 245 (5th Cir. 1993)). Rather, the plaintiff "… must <u>identify</u> the policy or custom which allegedly caused the deprivation of his constitutional rights." *Id.* (citing *Murray v. Town of Mansura*, 76 Fed.Appx. 547, 549 (5th Cir. 2003) and *Treece v. Louisiana*, 74 Fed.Appx. 315, 316 (5th Cir. 2003)).

Measured against the foregoing standards, Plaintiff's allegations the Sheriff in his official capacity fail to state a claim upon which relief can be granted as he does not allege that the purported deprivation resulted from a policy or custom, much less identify any such policy or custom. *Carter*, 2009 WL 3231826 at *2. Viewing Plaintiff's allegations as being made against the Sheriff in his individual capacity, he fares no better because "[p]laintiffs suing governmental officials in their individual capacities … must allege specific conduct giving rise to a constitutional violation. This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to the constitutional claims." *Id.* at *1 (quoting *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002)). As noted earlier, personal involvement is an essential element of a civil rights cause of action, *Thompson*, 709 F.2d t 382, and the doctrine of *respondeat superior* is not a concept that is applicable to §1983 proceedings. *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir.), *cert. denied*, 471 U.S. 1126, 105 S.Ct. 2659 (1985); *Lozano v. Smith*, 719 F.2d 756, 768 (5th Cir. 1983).

Here, other than identifying the Sheriff as a Defendant in the caption of and again on page five of his complaint, Plaintiff's principal pleading contains no allegations whatsoever regarding his involvement in the matters of which Plaintiff complains herein. Without such

personal involvement, there is simply no valid basis on which to hold the Sheriff liable here. Like the other Defendants, Plaintiff's §1983 claims against the Sheriff should be dismissed under §1915(e)(2)(B)(ii) for failure to state a claim upon which relief can be granted.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Defendants' motion be granted and that Plaintiff's §1983 claims against all Defendants be dismissed for failure to state a claim upon which relief can be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[6]

New Orleans, Louisiana, this 15th day of July, 2020.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[6] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.